**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **MORGAN HEUSCHMIDT** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 14 C 4377 |
| | ) | |
| v. | ) | |
| | ) | |
| **CAROLYN COLVIN** | ) | Magistrate Judge Daniel G. Martin |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Morgan Heuschmidt ("Plaintiff" or "Heuschmidt") seeks judicial review of a final decision of Defendant Carolyn Colvin, the Commissioner of Social Security ("Commissioner").  The Commissioner denied Plaintiff's application for child benefits and for supplemental security income under the Social Security Act in a March 1, 2013 written decision of Administrative Law Judge ("ALJ") Rebecca La Riccia.  Heuschmidt appealed the ruling to this Court and filed a Motion for Summary Judgment that seeks to reverse the Commissioner's decision.

## I.  Legal Standard

The ALJ applied the five-step analytic process that applies to adults to Plaintiff's claims throughout her alleged disability period.  Heuschmidt filed her application for child benefits on July 14, 2011, alleging that she became disabled on March 2, 2008.  Plaintiff was born on December 8, 1991.  The regulations permit child benefits to be given to a claimant who is younger than 18 years old; who is 18 or older and has a disability that began before she turned 22; or who is 18 or older and qualifies for benefits as a full-time

student. 20 C.F.R. § 404.350(a)(5). Plaintiff was under 18 as of her alleged onset date, but over 18 at the time of application. If a claimant is younger than 18 when she files her application, but turns 18 before the Commissioner determines her claims, the Commissioner uses the rules governing child claimants to evaluate the pre-18 period. "For the period starting with the day you attain age 18, we will use the disability rules we use for adults who file new claims." 20 C.F.R. § 416.924(f). In this case Plaintiff's alleged disability period includes a pre-18 period, but Heuschmidt filed her disability application after turning 18.

### A. The Social Security Administration Standard

In order to qualify for DIB, a claimant must demonstrate that he is disabled. An individual does so by showing that he cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 4243(d)(1)(A). Gainful activity is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b).

The Social Security Administration ("SSA") applies a five-step analysis to disability claims. *See* 20 C.F.R. § 404.1520. The SSA first considers whether the claimant has engaged in substantial gainful activity during the claimed period of disability. 20 C.F.R. § 404.1520(a)(4)(i). It then determines at Step 2 whether the claimant's physical or mental impairment is severe and meets the twelve-month durational requirement noted above. 20 C.F.R. § 404.1520(a)(4)(ii). At Step 3, the SSA compares the impairment (or combination of impairments) found at Step 2 to a list of impairments identified in the

regulations ("the Listings").  The specific criteria that must be met to satisfy a Listing are described in Appendix 1 of the regulations.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1.  If the claimant's impairments meet or "medically equal" a Listing, the individual is considered to be disabled, and the analysis concludes; if a Listing is not met, the analysis proceeds to Step 4.  20 C.F.R. § 404.1520(a)(4)(iii).

Before addressing the fourth step, the SSA must assess a claimant's residual functional capacity ("RFC"), which defines his exertional and non-exertional capacity to work.  The SSA then determines at the fourth step whether the claimant is able to engage in any of his past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  If the claimant can do so, he is not disabled.  *Id.*  If the claimant cannot undertake past work, the SSA proceeds to Step 5 to determine whether a substantial number of jobs exist that the claimant can perform in light of his RFC, age, education, and work experience.  An individual is not disabled if he can do work that is available under this standard.  20 C.F.R. § 404.1520(a)(4)(v).

**B.  Standard of Review**

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court.  Judicial review of an ALJ's decision is governed by 42 U.S.C. § 405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g). Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  A court reviews the entire record, but it does not displace the ALJ's judgment by reweighing the

facts or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

Instead, the court looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to her conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence. *Elder*, 529 F.3d at 413 (citation omitted).

### C.    The ALJ's Decision

The ALJ found at Step 1 that Heuschmidt had not engaged in substantial gainful activity since her alleged onset date. Plaintiff's severe impairments at Step 2 were fibromyalgia, chronic fatigue, hypothyroidism, depression, and anxiety. None of these impairments met or equaled a listing at Step 3, either singly or in combination. Before moving to Step 4, the ALJ found that Plaintiff's allegations concerning the severity of her symptoms were not credible. She assessed Heuschmidt's RFC as sedentary work with a number of exertional and non-exertional restrictions. Heuschmidt was limited to simple, routine, and repetitive tasks that only required occasional interactions with the general public. No relevant past work existed at Step 4. Based on the testimony of a vocational expert ("VE"), the ALJ concluded that a substantial number of jobs existed in the national economy that Plaintiff could perform. She therefore concluded that Plaintiff was not

disabled.

## II.  Discussion

The Court does not discuss the medical record in detail.  Both Heuschmidt and the Commissioner have carefully addressed the sparse medical evidence and are fully familiar with the relevant information.  In brief, Plaintiff suffers from fibromyalgia, chronic fatigue, hypothyroidism, depression, and anxiety.  She claims that her symptoms began when she was 15, and that she suffers from significant pain and fatigue.  She lives at home with her parents and attends the Illinois Institute of Art.

Heuschmidt claims that the ALJ erred by (1) incorrectly assessing her credibility, (2) improperly stating the RFC, and (3) failing to account for favorable testimony given by the VE.  Unhelpfully, Plaintiff conflates her credibility claims with the RFC allegations.  *See Morgan v. Colvin*, 2015 WL 5116961, at *5 (N.D. Ill. Aug. 28. 2015) ("Assessing a claimant's credibility is not the same thing as determining her RFC, though they are related. . . . Each has its own set of directives.").  This improperly leaves it to the Court to differentiate between these two issues.  In addition, the Court discusses other concerns about the ALJ's decision on its own motion.  A reviewing court may *sua sponte* address issues in social security cases.  *See*, *e.g.*, *Wenzlick v. Astrue*, 2009 WL 2777711, at *2 (E.D. Mich. Aug. 28, 2009) ("Several courts have found that a reviewing case may order remand *sua sponte*.") (citing cases); *Womack v. Astrue*, 2008 WL 2486524, at *5 (W.D. Okla. June 19, 2008) (citing cases).

### A.  Step 3

A claimant is presumptively disabled if he has an impairment or combination of

impairments that meets or medically equals a listing. An ALJ must satisfy three requirements when addressing a listing at Step 3. The listing under consideration should be identified by name. The ALJ must also consider a medical expert's opinion on the issue in question because the listings involve medical judgments. *Barnett v. Barnhart*, 381 F.3d 664, 670 (7th Cir. 2004) (citation omitted). Finally, the ALJ is required to provide an analysis of the listing issues that is "more than . . . perfunctory." *Id*. at 668.

ALJ La Riccia found that Plaintiff's mental disorders of depression and anxiety did not meet listings 12.04 or 12.06. However, the ALJ never explained why Plaintiff's physical impairments did not meet or equal a listing. It is true that chronic fatigue syndrome and fibromyalgia are not listed impairments. Nevertheless, an ALJ is still required at Step 3 to determine if fibromyalgia medically equals a listing. *See* SSR 12-2p ("At Step 3, therefore, we determine whether FM medically equals a listing . . . or whether it medically equals a listing in combination with at least one other medically determinable impairment."). As for chronic fatigue syndrome, SSR 99-2p states that when a claimant has that impairment "the specific findings . . . should be compared to any pertinent listing to determine whether medical equivalence may exist". ALJ La Riccia failed to make any inquiry into whether Heuschmidt's chronic fatigue and fibromyalgia equaled a listing.

The Court does not remand on this ground because the ALJ's oversight may have been tantamount to harmless error. In order to show that reversal is in order, a claimant is required to identify the medical evidence showing that he or she would have satisfied the Step 3 criteria if the ALJ had considered the relevant issues. *See Knox v. Astrue*, 327 Fed.Appx. 652, 655 (7th Cir. 2009) ("[A] claimant first has the burden to present medical findings that match or equal in severity all of the criteria specified by a listing.") (citation

6

omitted); *Alesia v. Astrue*, 789 F. Supp.2d 921, 932 (N.D. Ill. 2011) ("An ALJ need not specifically articulate why a claimant falls short of a particular listing unless the claimant has presented substantial evidence that she meets or equals the listing."). Heuschmidt has not done so here. Since this case already requires remand for the reasons stated below, however, the ALJ shall clarify her Step 3 reasoning on all of Plaintiff's mental or physical impairments.

### B.     Credibility

If an ALJ finds that a medical impairment exists that could be expected to produce a claimant's alleged condition, he must then assess how the individual's symptoms affect his ability to work. SSR 96-7p. The fact that a claimant's subjective complaints are not fully substantiated by the record is not a sufficient reason to find that he is not credible. The ALJ must consider the entire record and "build an accurate and logical bridge from the evidence to his conclusion." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). Factors that should be considered include the objective medical evidence, the claimant's daily activities, allegations of pain, any aggravating factors, the types of treatment received, any medications taken, and functional limitations. *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006); *see also* 20 C.F.R. § 404.1529(c)(3); SSR 96-7p. A court reviews an ALJ's credibility decision with deference and overturns it only when the assessment is patently wrong. *Jones v. Astrue*, 623 F.3d 1155, 1162 (7th Cir. 2010).

ALJ La Riccia said that Heuschmidt was not credible, though she plainly credited some of Plaintiff's subjective allegations. The ALJ seems to have meant that Plaintiff's testimony on the severity of her symptoms was not credible insofar as it was inconsistent

with the RFC assessment.  That meant that Heuschmidt's claims were believable to the extent that they showed that she could not perform light, heavy, or very heavy work; they were not credible insofar as Plaintiff alleged that she could not carry out the limited tasks of sedentary work.  The ALJ relied heavily on the objective record to reach this decision. That gives the Court greater discretion in reviewing the merits of the ALJ's assessment. *See Schomas v. Colvin*, 732 F.3d 702, 708 (7th Cir. 2013) ("But if the determination rests on objective factors . . . rather than subjective considerations like demeanor, we have greater freedom in reviewing the decision.") (internal quotes and citations omitted).

The Commissioner defends the ALJ's decision by arguing that the objective record provides substantial evidence for her credibility assessment.  The government points out, for example, that the ALJ discussed the results of Heuschmidt's exam with the consulting physician Dr. Ansari-Ali in March 2010.   The ALJ noted that Dr. Ansari-Ali found a normal gait with no cyanosis, clubbing, edema, or synovitis; Plaintiff had a full range of motion in most joints; and she had normal sensations, a normal cranial and cerebellar exam, and had no connective tissue disease.  Dr. Ansari-Ali only thought that Plaintiff "might" have fibromyalgia.  The ALJ relied on similar findings issued by the endocrinologist Dr. Amer Rahman after a January 2013 exam he made of Heuschmidt.  Dr. Rahman stated that Plaintiff's musculoskeletal and neurological exams were normal; her balance and gait were appropriate; and MRIs of her dorsal and cervical spine were unremarkable.

The problem with this line of argument is that the ALJ never explained why any of these medical conclusions were relevant to her credibility assessment.  It is difficult to see how they could be when Plaintiff does not allege that she has been disabled by any of the medical issues the ALJ cited.  Heuschmidt does not contend that she has an abnormal

cranial condition, difficulties in her gait, or less than a full range of motion in her joints. The fact that Dr. Ansari-Ali did not definitively conclude that Plaintiff suffers from fibromyalgia is particularly irrelevant to Plaintiff's credibility in light of the ALJ's Step 2 finding that she *does* have that impairment. The same line of reasoning applies to Dr. Rahman's conclusions. Plaintiff does not claim that she suffers from deformities in her spine and neck, or that her neurological sensations are at issue. Nor does she allege that she has a connective tissue disease. The ALJ could not rely on Dr. Ansari-Ali's and Dr. Rahman's findings to discredit Plaintiff without drawing some link between them and Heuschmidt's claims about her alleged disability.

Heuschmidt's actual claim is that she is unable to work because of her hypothyroidism, chronic fatigue syndrome, and fibromyalgia. The ALJ did not explain what Dr. Ansari-Ali's or Dr. Rahman's conclusions have to do with evaluating Heuschmidt's claims concerning her symptoms that stem from these disorders. The fact that Plaintiff's MRIs and neurological exams were normal does not address the severity of her fibromyalgia or chronic fatigue syndrome. Social Security Ruling 12-2p states that the existence of fibromyalgia is evaluated based on a "digital palpation with an approximate force of 9 pounds" on 18 "tender points" in a claimant's body. The Ruling does not cite any of the tests or findings in Dr. Ansari-Ali's or Dr. Rahman's treatment notes. The ALJ never explained why such tests were relevant to evaluating credibility when they are not even determinative for deciding if fibromyalgia exists.

Moreover, courts have been very clear that objective testing is not a reliable standard by which an ALJ can go about assessing the credibility of a claimant's fibromyalgia claims. "When a claimant has fibromyalgia, it is inappropriate for an ALJ to

reject her claims of pain because they are not verified by traditional medical tests." *Alexander v. Barnhart*, 287 F. Supp.2d 944, 965 (E.D. Wis. 2003) (citing cases). *See also Groskreutz v. Barnhart*, 108 Fed.Appx. 412, 417 (7th Cir. 2004) ("[F]ibromyalgia is a common, but elusive and mysterious disease frequently undetectable by laboratory tests."); *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (noting that the absence of relevant objective testing makes it difficult to assess the severity of fibromyalgia); *Dominguese v. Massanari*, 172 F. Supp.2d 1087, 1100 (E.D. Wis. 2001) ("In most cases, there will be no objective evidence indicating the presence or severity of fibromyalgia."). Thus even if the tests identified by SSR 12-2p were evidenced in the record (which, for the most part, is not the case), the ALJ would have faced difficulties in relying on them to assess Heuschmidt's credibility. She certainly could not cite medical tests that have no obvious relationship to deciding if fibromyalgia even exists.

Chronic fatigue syndrome presents a somewhat different set of requirements. Social Security Ruling 99-2p points out that the Centers for Disease Control does not require objective laboratory testing in order to determine if the disorder exists. *See* SSR 99-2p (noting that "the diagnosis of CFS can be made based on an individual's reported symptoms alone once other possible causes for the symptoms have been ruled out"). For disability purposes, however, "there must also be medical signs or laboratory findings before the existence of a medically determinable impairment may be established." SSR 99-2p. The Ruling identifies the primary tests for chronic fatigue to be digital palpation of the lymph nodes and tender points, tests for antibodies related to the Epstein-Barr virus, an MRI of the brain, and neurally mediated hypotension.

ALJ La Riccia did not cite anything in the record about these tests. The Court's review of the record suggests that few, if any, of them exist. Nevertheless, the ALJ still concluded that Plaintiff suffered from chronic fatigue syndrome.[1] She never said what it was that led her to that finding. Maybe it was based on Plaintiff's subjective testimony; perhaps it came from the diagnosis given by Dr. Priya Behari after a December 2010 exam. (R. 245, "I believe the patient is suffering from chronic fatigue syndrome."). But having found that chronic fatigue existed at Step 2, the ALJ could not discount Plaintiff's credibility about that disorder based on tests from Dr. Ansari-Ali and Dr. Rahman that are not identified in SSR 99-2p, and that bear no obvious relation to assessing either the existence or the severity of chronic fatigue syndrome.

The Court therefore disagrees with the Commissioner that the ALJ's credibility assessment must stand because Heuschmidt has not cited any objective medical evidence to support her allegations. (Dkct. 20 at 6). It is true that she has not done so; but neither has the ALJ. Moreover, it is not true that the absence of objective tests makes Plaintiff's subjective allegations incredible, as the government suggests. Social Security Ruling 96-7p makes clear that an ALJ may not reject a claimant's allegations about the severity of her condition "solely because they are not substantiated by the objective medical evidence." In this case, the ALJ did not show why the objective medical evidence she cited was pertinent to Plaintiff's testimony about fibromyalgia and chronic fatigue syndrome at

---

[1] The Court stresses this point because the Commissioner claims somewhat enigmatically that "the ALJ did *not* find that Plaintiff had chronic fatigue syndrome; rather, she found that Plaintiff's chronic fatigue was a severe impairment." (Dckt. 20 at 3) (emphasis added). Insofar as a distinction exists between having an impairment and having a diagnosed disorder, the ALJ did not rely on it in her decision.

all. The Court therefore turns to the other, and quite limited, grounds that the ALJ cited in her attempt to discount Heuschmidt's allegations.

The ALJ's primary reason for rejecting Heuschmidt's allegations concerning her pain and anxiety was that she was able to attend school at the Illinois Institute of Art. She also relied on Plaintiff's ability to sleep. The ALJ stated:

> While her hours of school attendance are few, she has been able to complete 16 classes since starting this [interior design] program in the fall of 2010. The claimant maintains that she is unable to sleep at night due to anxiety but she acknowledges sleeping from 5 a.m. to 2 p.m., so she is getting nine hours of sleep, on average, with medication. There are no records in the file to show that the claimant has ever been evaluated for sleep hygiene. (R. 25).

This fails to provide a cogent reason for discounting Plaintiff's credibility. Heuschmidt told the ALJ that she experienced profound difficulties in sleeping. She suffers from panic attacks during the night and regularly sleeps with her mother. (R. 43). As the ALJ noted, Plaintiff ordinarily goes to sleep at 5 a.m. and stays asleep through much of the day. The ALJ seems to have thought that this posed an unproblematic scenario that would permit Heuschmidt to work. Yet common sense suggests that a claimant who needs to sleep through two-thirds of an ordinary work day may experience some difficulty in sustaining work on a regular basis. Plaintiff's testimony clearly raised serious questions about how she could work a normal 9 to 5 job. The ALJ never addressed the issue or asked the VE to testify on the topic.

As for Heuschmidt's course work, the ALJ's account of the matter seriously understates what Plaintiff actually said at the hearing. She only attends class once a week. The school is only ten minutes from her home. Even then, Plaintiff has missed half of her classes because she did not feel well enough to attend. She has been forced to drop two

of the courses she signed up for. Heuschmidt's primary instructor also gives her significant freedom to stand up, walk around, or even leave the room for up to 15 minutes at a time during class. (R. 46-47, 56-57). The ALJ never explained why these exceptionally broad freedoms or Plaintiff's casual approach to her limited course work suggested that she was not credible. Taken at face value, Heuschmidt's testimony supports rather than undermines her claim that she cannot work eight hours a day, five days a week. If the ALJ thought differently, she should have assessed what Heuschmidt actually said at the hearing, and asked the VE if an employer would tolerate the self-pacing that Plaintiff described.

Part of the ALJ's oversight on this matter involved a more basic failure to assess Plaintiff's activities of daily living ("ADLs") in light of Heuschmidt's full testimony. ALJ La Riccia overlooked that Plaintiff told her that she has good days and bad days. An ALJ is required to consider such testimony when assessing ADLs. *See*, *e.g.*, *Buckner v. Astrue*, 680 F. Supp.2d 932, 941 (N.D. Ill. 2010) (finding an ALJ must account for such testimony when relying on a claimant's ability to carry out ADLs); *Gotz v. Barnhart*, 207 F. Supp.2d 886, 897 (E.D. Wis. 2002) ("The ALJ must determine the frequency of plaintiff's 'bad days' and decide if their occurrence precludes full-time work."). The ALJ should have been alert to this issue because many authorities reinforce the necessity of considering the potentially fluctuating nature of Heuschmidt's condition. Social Security Ruling 96-7p instructs ALJs that they must consider the fact that "[s]ymptoms may vary in their intensity, persistence, and functional effects, or may worsen or improve with time, and this may explain why the individual does not always allege the same intensity, persistence, or functional effects of his or her symptoms." SSR 96-7p. The Ruling concerning fibromyalgia is equally

straightforward; "symptoms of FM can wax and wane so that a person may have 'bad days and good days.'" SSR 12-2p. And, of course, it is well-established that claimants like Heuschmidt who suffer from mental disorders may have symptoms that wax and wane. *See*, *e.g.*, *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011). The ALJ recognized that Plaintiff had told her that depression made her want to stay in bed all day on some occasions. (R. 42). The ALJ rejected that claim because Plaintiff attended the Illinois Institute of Art. The shortcomings of that reasoning are outlined above.

The relatively sparse medical record contains a number of exam results and reports from Plaintiff's treating and consulting physicians. The ALJ found it noteworthy that none of these experts had assessed any limitations "consistent with disability." (R. 26). In fact, none of Plaintiff's treating physicians assessed work or exertional limitations at all. Nor should the ALJ have expected them to do so. Heuschmidt was not working when she saw any of the physicians whose treatment notes are contained in the record. That meant that the ALJ had no ground to cite the absence of work limitations to discount Plaintiff's testimony, at least without explaining the basis of her reasoning in greater detail. Courts have rejected the notion that a non-working claimant's credibility can be attacked because his doctors do not issue serious work restrictions. *Eskew v. Astrue*, 462 Fed.Appx. 613, 616 (7th Cir. 2011) ("The absence of major work restrictions in Eskew's medical records does not illuminate the question of her credibility – she was after all unemployed throughout the time in question."); *Macon v. Astrue*, 2012 WL 4854557, at *9 (N.D. Ill. Oct. 11, 2012).

ALJ La Riccia noted that Heuschmidt stated that she could only walk for 10 minutes at a time, and could only sit for up to 30 minutes. However, the ALJ never explained why

this was not credible. She may have relied on the fact that Plaintiff testified that she practices yoga. The problem with that is that the ALJ again failed to account for important aspects of what Plaintiff said on this topic. Heuschmidt stated that she only does yoga at home for 30 minutes twice a week. (R. 52). She suggested that it was not demanding because she uses a special DVD designed for individuals like her who suffer from fibromyalgia. Even then, she experiences pain afterwards. (R. 52). The ALJ never explained why Plaintiff's ability to do one hour of fibromyalgia-appropriate stretching exercises each week meant that she could work full time.

The ALJ also relied on the fact that Heuschmidt could work on her computer up to three hours a day. But Heuschmidt explained that she only uses her computer one hour at a time. She then must take a break "because I start, my eyes start dropping and I get tired and I start losing my concentration." (R. 51). Plaintiff then linked this lack of sustained concentration to the drowsiness she said was a side effect of her medication. The ALJ noted her testimony but never explained why it was not credible. Social Security Ruling 96-7p obligated ALJ La Riccia to account for Plaintiff's alleged medication side effects.

The ALJ may have thought that she addressed Plaintiff's ability to sustain attention by relying on the neuropsychological report of consulting specialist Dr. Susannah More. Dr. More noted that Heuschmidt had "good energy and motivation" to complete her tasks and that she only appeared to be "slightly fatigued at the end of the [psychological] testing" that was administered. (R. 26). Dr. More assessed Plaintiff's cognitive functioning as being within the average range for attention, memory, language, and intellectual ability. The ALJ went on to cite Dr. More's report to support her credibility and RFC conclusions.

15

Unfortunately, the ALJ failed to recognize that Dr. More's comments about Plaintiff's energy and ability to deal with fatigue require further explanation. The difficulty stems from an ambiguity in how Heuschmidt went about taking the tests that Dr. More administered. The psychologist's report states that Heuschmidt told her that she "needed to stretch and take breaks during testing, due to fatigue and pain." (R. 307). Such a request would have been fully consistent with Plaintiff's hearing testimony about her need for breaks during class or when using her computer. However, the expert report does not clarify if Dr. More accommodated Plaintiff's request for breaks or not. If she did, then the ALJ was not automatically entitled to rely on the fact that Plaintiff had "good energy" at the conclusion of her testing period without accounting for such breaks. The ALJ clearly thought that Dr. More's comment supported her conclusion that Heuschmidt could sustain regular work. But a person who has energy after completing a demanding battery of psychological tests without taking breaks does not necessarily have the same work endurance as an individual who requires them. The ALJ could have easily clarified the matter simply by asking Plaintiff about it at the hearing.

The point was important because other questions exist about how Dr. More considered the impact and importance of Plaintiff's fatigue. Dr. More applied the Minnesota Multiphasic Personality Inventory-II ("MMPI-II"), a standard test for assessing personality. It is not clear what the psychologist's specific assessment was. (R. 310, "[Plaintiff] produced a valid profile."). The important point is that Dr. More noted that individuals who share Heuschmidt's MMPI-II profile "tend to experience distress related to pain and illness." They also report "fatigue, reduced energy . . . [and] sleep disturbance" as well as mental symptoms such as depression and anxiety. She further said that these

16

individuals prefer a medical explanation for their symptoms instead of attributing them to their true psychological source. Nevertheless, Heuschmidt and those like her are still able "to function with reduced efficiency." (R. 310). The ALJ was aware of this set of findings because she noted with approval that Dr. More concluded that Plaintiff could "function with reduced efficiency despite distress related to pain and illness." (R. 26). The ALJ clearly thought that "reduced efficiency" meant that Plaintiff could perform sedentary work, and was therefore not credible in alleging that she could not work at all.

The ALJ's line of reasoning on this issue is seriously flawed. Dr. More attributed Plaintiff's complaints of fatigue, depression, and sleep disruption to her psychological profile; Plaintiff could operate with "reduced efficiency" despite fatigue *because* she was like others who shared her MMPI-II results. The ALJ failed to realize, however, that Dr. More was unaware that Heuschmidt also suffered from chronic fatigue syndrome.[2] A person with Plaintiff's MMPI-II profile and chronic fatigue may well be more restricted than Dr. More said she was based on the MMPI-II score alone. The ALJ's reliance on Dr. More never accounted for this fact, thereby overlooking the full scope of Plaintiff's fatigue-related impairments. Contrary to Dr. More's belief, Plaintiff's fatigue and other problems were not only a function of her personality profile. The primary symptom of chronic fatigue syndrome is (obviously) fatigue that results from the individual's medical condition. Much the same is true of Heuschmidt's mental symptoms. Social Security Ruling 99-2p states that a claimant with chronic fatigue "may also exhibit medical signs, such as anxiety or depression, indicative of the existence of a mental disorder." That is, a claimant like

---

[2] The psychologist said that Plaintiff had Lyme disease and fibromyaglia. (R. 311). The ALJ noted in her decision that Heuschmidt did not suffer from Lyme disease.

Heuschmidt may complain of fatigue and emotional symptoms that result from a genuine medical condition, not from (or at least not only from) the personality profile that Dr. More relied on. Thus the fact that a claimant with Plaintiff's personality profile can perform tasks with reduced efficiency does not mean that someone with that profile and chronic fatigue syndrome can do so.

At a minimum, the ALJ was obligated to explain why she thought that was not the case and why reliance on Dr. More's statements was in order. Her oversight of this and other significant credibility factors fails to build a logical bridge between the record and her credibility assessment. Plaintiff's motion is granted on the credibility issue.

### C.    The RFC

In light of the ALJ's erroneous credibility assessment, the Court does not address Plaintiff's RFC claims in detail. The ALJ's reconsideration of Plaintiff's credibility will already require her to ensure that the RFC accounts for her new findings. In addition, SSR 96-8p obligates an ALJ to provide a narrative discussion of "the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis." ALJ La Riccia did not do so in this case. That is especially troubling because the ALJ also failed to account properly for Heuschmidt's testimony about her daily functioning and her fluctuating symptoms. Remand may not be necessary for this reason when the ALJ otherwise accounts for the record adequately. *See Potrebic v. Colvin*, 2014 WL 4722525, at *16 (N.D. Ind. Sept. 22, 2014). But that did not happen here for all the reasons discussed above. The ALJ did not account for Plaintiff's sleep problems properly, overstated her role as a student, and failed to note the fluctuating nature of fibromyalgia symptoms that SSR 12-2p describes. *See Gotz*, 207 F. Supp.2d at 897; *Silva v. Barnhart*,

18

2003 WL 22425010, at *10 (N.D. Ill. Oct. 23, 2003) (finding that remand can be warranted when an ALJ issues an RFC without accounting for a claimant's testimony that she experiences good days and bad days).   Plaintiff's motion is granted on the RFC issue.

**D.   Step 5**

Generally, an ALJ is obligated to include all of a claimant's limitations in the hypothetical questions that he submits to a VE at Step 5. *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010).  ALJ La Riccia asked the VE to assume an individual who could perform sedentary work, together with the exertional and non-exertional restrictions that the ALJ assessed in her RFC.  The VE testified that such a person could perform work as a hand sorter, assembler, or packer and cited the relevant portions of the Dictionary of Occupational Titles ("DOT").  The ALJ then asked the VE to assume that the hypothetical individual she had just described would have the additional restriction of not being able to carry out work "that would require high production quotas or high productivity."  (R. 61). The VE answered that this additional restriction would preclude all work for the claimant. That means, of course, the claimant would be rendered disabled.  ALJ La Riccia's decision does not address the VE's favorable testimony concerning the second restriction.

Heuschmidt's argument on the Step 5 issue is far from clear.  She implies that an ALJ automatically commits reversible error when he fails to address favorable testimony given by a VE at Step 5.  That is certainly not the case, at least in the narrow sense that Plaintiff suggests.  *See Woszowaty v. Astrue*, 861 F. Supp.2d 924, 948 (N.D. Ind. 2012); *Hodges v. Barnhart*, 509 F. Supp.2d 726, 736 (N.D. Ill. 2007).  Plaintiff disputes that conclusion by citing *Reese v. Colvin*, 2014 WL 1319364, at *12 (N.D. Ind. March 27, 2014)

and *Olson v. Astrue*, 2009 WL 2365511, at *13 (N.D. Ill. March 16, 2009). But these cases do not support the *per se* rule that Plaintiff advocates. *See Virden v. Colvin*, 2015 WL 5598810, at *13 (C.D. Ill. Sept. 22, 2015) (rejecting the same argument made by Plaintiff's counsel in this case). As *Virden* points out, *Reese* and *Olson* involve a more nuanced analysis. They required remand because the VE testified "on an issue that would preclude work, and the ALJ mishandled that dispositive issue when determining the claimant's [RFC]." *Id*. That is to say, the ALJ failed to properly account for the record in fashioning the RFC.

The Court agrees with Plaintiff that the ALJ in this case fell into that error. The government claims that the ALJ was not required to address the VE's testimony because she did not find that any limitations on "high production quotas or high productivity" were credible. That could only be the case, however, if the ALJ's account of the record was adequate. It is not for all the reasons stated above. The ALJ did not properly account for Heuschmidt's ADLs, school work, fluctuating symptoms, or exertional limitations. The ALJ's reliance on Dr. More's conclusion that Plaintiff could work with "reduced efficiency" is particularly troubling. Even if the ALJ was correct in believing that finding supported sedentary work, it is unclear why it means that Plaintiff could continually perform work that required "high productivity." A reasonable inference from Dr. More's assessment is that Heuschmidt would face significant challenges in carrying out the high level of functioning that was involved in the ALJ's second hypothetical restriction to the VE.[3]

─────────────

[3] The issue involves, at least in part, Heuschmidt's concentration, persistence, and pace. The RFC limits Heuschmidt to "simple, routine, and repetitive tasks." (R. 23). The Seventh Circuit has made clear that in most cases these terms "on their own will not necessarily exclude from the VE's consideration those positions that present significant

Under these facts, the Court agrees that the ALJ was obligated to discuss this issue in her decision. Without accounting for the record properly, the ALJ appears to have elicited VE testimony that she found to be unwelcome and then fashioned the RFC to avoid it. That would involve a very serious error. *See Reese*, 2014 WL 1319364, at *12 ("It appears that the ALJ may have made his RFC determination on the basis of the VE testimony, rather than honestly appraising Plaintiff's abilities as reflected in the medical record, a grave error.") (citing cases). Even if the ALJ did not do so, she still failed to build a logical bridge between the record and her crucial assumption that Heuschmidt could perform high quota work. An ALJ always has a duty to account for all the relevant evidence without selecting only those portions that support her decision. *Golembieweski v. Barnhart*, 382 F.3d 721, 724 (7th Cir. 2004). That is particularly true when, as here, the ALJ also receives favorable testimony from the VE that the ALJ herself elicited. *See Olson*, 2009 WL 2365511, at *13 ("This general rule has special force in cases where the ALJ invites the testimony and opinions of a VE at Step Five, but then disregards the testimony without discussion.").[4]

---

problems of concentration, persistence, and pace." *O'Connor-Spinner*, 627 F.3d at 620. The ALJ was required to explain more thoroughly why Plaintiff could sustain high productivity in light of the moderate restriction in concentration, persistence, and pace that she assessed for Heuschmidt.

[4] When a VE gives testimony about the requirements of a job, the ALJ must ask the VE if his testimony is consistent with the information provided in the DOT. SSR 00-4p. The Seventh Circuit has stressed that an ALJ has an affirmative duty to do so. *Prochaska*, 454 F.3d at 735; *see also Overman v. Astrue*, 546 F.3d 456, 462-63 (7th Cir. 2008). ALJ La Riccia did not make such an inquiry. Her error can be harmless if no actual conflict exists. *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009). That seems to be the case here in light of Plaintiff's silence on the issue. Since this case already requires remand, however, the ALJ should correct her mistake and comply with the requirements of SSR 00-4p.

### III.  Conclusion

For all these reasons, Plaintiff Morgan Heuschmidt's Motion for Summary Judgment [13] is granted.  The Commissioner's decision is remanded to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.  On remand the ALJ shall: (1) clarify her Step 3 reasoning; (2) reassess Plaintiff's credibility by addressing all the factors stated in SSR 96-7p and accounting more carefully for Dr. More's report; (3) explaining how the record supports the RFC; (4) explaining her reasons for rejecting the VE's testimony that was favorable to Plaintiff; and (5) comply with SSR 00-4p.

ENTERED:

_____
DANIEL G. MARTIN
United States Magistrate Judge

Dated: November 30, 2015.